IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | | |
|---|---|---|
| Tammie W. Johnson, | ) | Civil Action No. 6:06-3086-RBH-WMC |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **O R D E R** |
| | ) | |
| Michael J. Astrue, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This case is before the court for a final order pursuant to Local Rule 73 and Title 28, United States Code, Section 636(c).  The case was referred to this court for disposition by order of the Honorable R. Bryan Harwell, United States District Judge, filed May 23, 2007.

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for disability insurance benefits (DIB) and supplemental security income (SSI) benefits on February 18, 2003, respectively, alleging that she became unable to work on April 19, 2002.  The applications were denied initially and on reconsideration by the Social Security Administration.  On June 18, 2004, the plaintiff requested a hearing.  The administrative law judge, before whom the plaintiff and her attorney appeared on October 21, 2005, considered the case *de novo*, and on May 9,

2006, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.  The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on September 1, 2006.  The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

(1)     The claimant meets the insured status requirements of the Social Security Act through September 30, 2006.

(2)     The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 404.1520(b), 404.1571 et seq., 416.920(b) and 416.971 et seq.).

(3)     The claimant has the following medical determinable severe impairments: anxiety disorder, not otherwise specified; mood disorder due to chronic pain with depressive symptoms; degenerative disk disease with mild to moderate disk desiccation, some small anular tears at L3-4, L4-5 and L5-S1, and some facet arthropathy; chronic pain syndrome with significant psychological component; headaches; insomnia; and narcotic and benzodiazepine dependency secondary to her chronic pain syndrome (20 CFR 404.1520(c) and 416.920(c)). The claimant also has high blood pressure and a history of gastritis, but as these impairments are either controlled by medication or have caused no functional limitations, they are not "severe" within the meaning of the Regulations.

(4)     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404 Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

(5)     After careful consideration of the entire record, I find that the claimant has the residual functional capacity for light exertional work.

(5) [sic]     The claimant is capable of performing past relevant work as a waitress and cashier.  These jobs do not require the performance of work-related activities precluded by the

2

claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

(6) [sic]    The claimant has not been under a "disability," as defined in the Social Security Act, from April 19, 2002 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."   42 U.S.C. §423(a).   "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520.  If an individual is found not disabled at any step, further inquiry is unnecessary.  20 C.F.R. §404.1503(a).  *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

4

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The record reveals that the plaintiff was 35 years of age at the time of the Commissioner's final decision (Tr. 56). She has the equivalent of a twelfth-grade education and past work experience as a waitress and a cashier (Tr. 81, 93, 97).

The records of Dr. David B. Gammon, M.D., a family physician, between March 4, 2002, and October 14, 2005, revealed treatment with medication for low back and fibromyalgia-related chronic pain, occasional headaches, three episodes of hyperventilation-related syncope (fainting), and depression (Tr. 132-136, 139-140, 180-183, 188, 191, 248). During this period, a lumbar spine magnetic resonance imaging revealed degenerative disc and degenerative joint disease, small annular tears, and a mild disc bulge (Tr. 116). An abdominal computerized tomography (CT) scan revealed no evidence of abdominal or pelvic process (Tr. 184-185). A brain CT scan was normal (Tr. 186). The plaintiff reported that she was receiving Medicaid services (Tr. 191).

The plaintiff was examined on April 23, 2002, with complaints of back and headache pain since a recent fall. Examination revealed lumbar tenderness and spasm, but also that the plaintiff was alert and oriented in three spheres, and demonstrated normal lumbar spine ranges of motion, normal extremity muscle strength throughout, normal extremity ranges of motion throughout, and normal upper extremity sensation. X-rays of the cervical, dorsal, and lumbar portions of the spine were normal (Tr. 118-27).

5

The plaintiff underwent physical therapy between May 2 and June 11, 2002, and was discharged on July 25, 2002. During this period, examinations revealed that the plaintiff was neurologically intact and demonstrated 50% to 75% of normal lumbar spine ranges of motion and mildly reduced trunk strength (Tr. 137-38, 189, 192-98).

Dr. William Wheeler examined the plaintiff on February 5, 2003, with complaints of vomiting. Examination revealed that the plaintiff was oriented to time, place, person, and situation, and demonstrated equal, round, reactive, reactive pupils, normal extraocular movements, full extremity ranges of motion, good extremity muscle strength, and normal extremity reflexes. An esophagogastroduodenoscopy on February 13, 2003, revealed gastritis and a helicobacter pylori infection. A gallbladder ultrasound was normal (Tr. 109).

In a statement dated February 27, 2003, Dr. Gammon stated that the plaintiff had lumbar degenerative disc disease, fibromyalgia, opioid-dependent chronic pain, depression, and gastritis, and that she had experienced minor improvement with treatment (Tr. 130-131).

In a statement dated March 10, 2003, the plaintiff reported that she took diazepam (Valium),[1] Neurontin,[2] Remeron (mirtazapine),[3] Roxicodone (oxycodone)[4] and Wellbutrin,[5] and used a Duragesic patch,[6] and that she had no side effects of these medications (Tr. 96-97).

──────────────

[1]An anxiolytic medication. *See Mosby's Drug Consult* (16th ed. 2006) (*Mosby's*), available on Stat!Ref Library CD-ROM (Fourth Qtr. '06).

[2]An anticonvulsant medication used in treatment of neuralgia. *See Mosby's*.

[3]An antidepressant medication. *See Mosby's*.

[4]A pain medication for treatment of moderate to moderately severe pain. *See Mosby's*.

[5]An antidepressant medication. *See Mosby's*.

[6]An analgesic medication of short duration used during anesthetic, premedication, induction, maintenance, and postoperative periods as the need arises. *See Mosby's*.

6

Joseph K. Hammond, Ph.D., a consultative psychologist, examined the plaintiff on May 20, 2003. The plaintiff reported back and right arm pain since a fall in April 2002, for which she took medication, including pain, anti-anxiety, and antidepressant medication, that was somewhat effective; sleep difficulty; and poor appetite. She also reported depression. Examination revealed that the plaintiff was alert and oriented in all spheres and demonstrated fair to good insight; relevant, coherent, and goal-directed thinking without signs of thought disorder; normal speech and memory; the absence of psychomotor agitation or retardation; and the abilities to follow directions and sit, rise and, ambulate without assistance or devices. The plaintiff denied hallucinations, delusions, concentration or memory difficulty, and psychiatric hospitalization or regular outpatient mental health care. She reported that she cared for her own personal needs, performed household cleaning and other chores, prepared simple meals, drove an automobile, shopped, dated and maintained a relationship with a boyfriend, and visited her boyfriend at work. She also reported that she found pleasure and interest in her life and was satisfied with her relationship with her boyfriend and her son, was aware of her financial status, and had financial concerns. Dr. Hammond concluded that he could not rule out that the plaintiff had an adjustment disorder with depressed and anxious mood in response to a pain condition, and a psychological contribution to her pain disorder, and that she had moderate impairment in various areas of functioning but was capable of sustained attention and completion of simple and repetitive tasks (Tr. 153-56).

In a statement dated June 16, 2004, the plaintiff, through counsel, reported that she took Seroquel,[7] Toprol,[8] Avinza,[9] oxycodone, mirtazapine, Neurontin, diazepam,

---

[7] An antipsychotic medication used in treatment of bipolar disorder. *See Mosby's.*

[8] An antihypertension medication. *See Mosby's.*

[9] A pain medication for treatment of severe acute pain, or moderate to severe chronic pain. *See Mosby's.*

and "Budeprion," and used a Duragesic patch, and that she experienced no side effects of any of these medications (Tr. 65, 69).

Dr. Patrick B. Mullen, the plaintiff's consultative psychiatrist, examined the plaintiff on August 30, 2004. The plaintiff reported back and headache pain and depression since a fall in April 2002, for which she took medication that was somewhat effective. She also reported hip and knee pain, and concentration and memory difficulties. She further reported that she attended her son and performed limited automobile driving, and that she was receiving public assistance. Examination revealed agitated psychomotor activity, a depressed mood and affect,; anxious, somewhat disconnected thought process/content, and the appearance of pain, but also good orientation and clear sensorium, logical and coherent thought, normal speech, fair memory, the absence of hallucinations, good hygiene, and good intelligence. Dr. Mullen diagnosed major depression, a chronic pain disorder, and a history of a back injury. He stated that the fact that the plaintiff did not slur her speech despite a high dose of medication was evidence of a severe pain "problem. He concluded that the plaintiff was unable to work (Tr. 175-77).

Examination on March 22, 2005, due to depression revealed a sad, depressed mood, but also that the plaintiff was oriented to time, place, and person, and demonstrated normal dress, normal speech and thought, normal flow of thought, the absence of evidence of psychosis, adequate attention, adequate memory for recent, remote, and past events, adequate insight, adequate judgment, adequate impulse control, and normal intellectual functioning. The plaintiff denied past psychiatric hospitalization and reported the absence of anxiety, adequate appetite and sleep, and smoking cigarettes (Tr. 236-37).

Dr. Robert D. Cox III, examined the plaintiff on April 1, 2005, with complaints of depression and bipolar disorder for which she took medication. Examination revealed that the plaintiff was alert and oriented, and demonstrated appropriate mood and affect, the

8

absence of evidence of psychotic processes, and clear, coherent, goal-directed speech. The plaintiff denied suicidal ideation and reported receiving Medicaid services.  Dr. Cox diagnosed recurrent major depressive disorder and probable bipolar disorder by history, as well as reported histories of hypertension, migraine headaches, surgical reattachment of a hand, financial stressors, and dysfunctional family problems, and assessed a current Global Assessment of Functioning (GAF) of 70[10] and highest GAF in the past year of 70 (Tr. 234).

In a statement dated October 14, 2005, Dr. Gammon indicated that the plaintiff was unable to work due to chronic back pain requiring opiate medication, chronic depression, and chronic fatigue despite treatment (Tr. 178-179).

In a statement dated October 20, 2005, the plaintiff reported that she took Atenolol,[11] Remeron, Neurontin, Wellbutrin, Valium, Seroquel, oxycodone, Avinza, Duragesic, and Zantac (Tr. 61).

Larry R. Korn, D.O., a consultative physician, examined the plaintiff on November 21, 2005.  The plaintiff reported back pain since a fall in April 2002, for which she took medication that was somewhat effective.  She also reported bilateral shoulder and right knee pain, headache pain, and depression.  She further reported that she received Medicaid services.  She additionally reported that she stayed busy caring for her home and attending her child, and that she performed limited automobile driving.  Examination revealed a mildly depressed affect, anxiety, limited left shoulder motion, and a lot of pain demonstrations and comments.  Examination also revealed that the plaintiff was alert and oriented in three spheres and demonstrated normal cranial nerve functioning, reactive

---

[10]A GAF between 61 and 70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.  *See Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed.).

[11]An antihypertension medication.  *See Mosby's.*

pupils, normal vision without correction, and adequate communication and comprehension. Examination further revealed an only nonspecifically abnormal station and mildly and only nonspecifically abnormal gait and the ability to heel, toe, and tandem walk; normal right shoulder motion; "unremarkable" elbows and normal elbow ranges of motion; "unremarkable" wrists and normal wrist ranges of motion; normal hand muscle bulk and strength; "unremarkable" fingers and normal digital dexterity; normal lower extremity joints and the absence of lower extremity crepitus or deformity; the absence of lower extremity edema; essentially normal lower extremity ranges of motion and the ability to squat nearly completely, including normal knee, hip, and ankle ranges of motion; normal reflexes, and positive Waddell tests.[12]  Dr. Korn diagnosed chronic pain syndrome with a significant psychological component and a possible physical component, and narcotic and benzodiazepine habituation.  He concluded that low back measurements were of no value, and that the plaintiff's subjective pain was the most substantial cause of her limitations, as well as "mood and mental health difficulties."  He indicated that the plaintiff could lift, stand, walk, sit, push, pull, manipulate, see, and communicate without restriction; and climb, balance, kneel, crouch, crawl, and stoop frequently; but that she should not operate dangerous moving machinery or work at heights (Tr. 199-202).

Dr. Anthony G. Carraway, a consultative psychiatrist, examined the plaintiff on December 1, 2005.  The plaintiff reported depression, chronic pain due to fibromyalgia, and sleep and appetite difficulties.  She denied psychiatric hospitalization; psychotic symptoms, including delusions and perceptual disturbances; and manic symptoms.  She

---

[12]Waddell tests are a set of five maneuvers easily performed during a routine physical examination that identify patients in whom nonorganic issues play a role in the persistence of symptoms; these nonorganic physical signs are: inappropriate, nonanatomic tenderness to light touch; vertical loading on a standing patient's skull and passive rotation of shoulder and pelvis in the same plane cause low back pain; discrepancy between findings on sitting and supine straight leg raise testing; cogwheel (give-way) weakness; nondermatomal sensory loss; and disproportionate facial expression, verbalization, or tremor during examination.  See Robert L. Bratton, M.D., Assessment and Management of Acute Low Back Pain American Family Physician (November 15, 1999) http://www.aafp.org/afp/991115ap/2299.html (citations omitted).

reported good interpersonal relations. She also reported that she received Medicaid services, rental subsidies, and food stamps. She further reported that she cared for her own personal needs and drove an automobile with difficulty, and that her son assisted her out of bed. Examination revealed an irritable affect, a depressed mood, mild to moderate impairment of short-term memory. and decreased speech rate and tone, but also good eye contact, the absence of psychomotor agitation or retardation, logical, goal-directed, and well-organized thought without thought disorder, the absence of delusions and perceptual disturbances, normal memory for remote events, the absence of neurovegetative or melancholic qualifiers, only mild attention and concentration difficulty, and average intellectual functioning. The plaintiff denied auditory, visual, somatic, olfactory, and tactile hallucinations. Dr. Carraway diagnosed an anxiety order, a mood disorder due to chronic pain, chronic pain syndrome, and single parenting issues. He concluded that the plaintiff had no limitation in her ability to make judgments on simple work-related decisions; that she had slight limitations in her abilities to understand, remember, and carry out short, simple instructions; that she had a mild to moderate limitation in stress tolerance; and that she had moderate limitations in her abilities to understand, remember, and carry out detailed instructions, interact appropriately with the public, supervisors and co-workers, and respond appropriately to work pressures in a usual work setting and changes in a routine work setting (Tr. 208-213).

In a statement dated March 20, 2003, the plaintiff reported that she performed limited household cleaning and other chores (Tr. 78), prepared meals with effort (Tr. 78), drove an automobile with effort (Tr. 80), grocery shopped with effort (Tr. 79), took her son clothing shopping (Tr. 79), and went out to pay household bills (Tr. 78). She also reported that her boyfriend assisted her in bathing, and her 11-year old son and boyfriend assisted her in rising from a sitting or squatting position and "[took] care of [her]" (Tr. 77-78), and that her son and boyfriend assisted with household cleaning and other chores (Tr. 78). She

further reported that she received food stamps (Tr. 79). She additionally reported that she and her son resided in an apartment with upstairs bedrooms, but that she would not sleep downstairs while her son slept upstairs in case of fire (Tr. 78). She also reported that she took Remeron (Tr. 77).

At her hearing on October 21, 2005, the plaintiff testified that she resided with her son in an apartment with stairs (Tr. 242, 253, 257). She also testified that she had past work experience as a waitress (Tr. 246-47). She further testified that she was unable to work due to a back disorder since falling down a flight of steps in her apartment, headaches, and "nerves" (Tr. 243-44, 247-58, 264). She additionally testified that she took pain, sleep, and antidepressant medications prescribed by her family physician that caused weight gain, memory difficulty, loss of libido, and drowsiness, but were somewhat effective, and that she could not work on medication (Tr. 244-45, 250-53, 255-57, 260, 262-63). She also testified that she had concentration difficulty (Tr. 257), but that she took medication independently (Tr. 260). She further testified that some mornings she could not get out of bed (Tr. 251), and that her son was "scared to leave [her] at home" (Tr. 256).

The plaintiff stated that she performed limited household cleaning and other chores (Tr. 254-55), prepared simple meals (Tr. 254), watched soap operas on television (Tr. 261), attended her son (Tr. 259), possessed a driver's license and drove an automobile with effort (Tr. 244, 252, 255), transported her son to and from school "if [she could] get up[,]" although school bus service was available (Tr. 244, 258-59), transported her son to a grocery store and waited in the automobile while he shopped (Tr. 252, 260), and managed household finances (Tr. 260). She also stated that her former boyfriend and her son assisted her with household cleaning and other chores (Tr. 257, 259). She further stated that she received Aid to Families With Dependent Children ("AFDC"), food stamps, and Medicaid services (Tr. 242-43, 249).

12

## ANALYSIS

The ALJ found that the plaintiff could perform light exertional work and that she could perform her past relevant work as a waitress and cashier (Tr. 21, 27). The plaintiff alleges that the ALJ erred by (1) failing to consider the vocational consequences of her pain; (2) failing to assign any weight to the opinion of her treating physician; (3) failing to properly assess her RFC; and (4) failing to obtain vocational expert testimony in light of her significant nonexertional limitations.

### Pain

The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the

evidence in the case record." Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." SSR 96-7p, 1996 WL 374186, *4.

In addition to the objective medical evidence, the factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)    the individual's daily activities;

(2)    the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)    factors that precipitate and aggravate the symptoms;

(4)    the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)    treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)    any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)    any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, *3.

The ALJ stated: "I do not find any medical condition which could reasonably be expected to cause the claimant 'disabling' pain, and that the claimant's statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible" (Tr. 23). However, as argued by the plaintiff, the plaintiff's MRI showed degenerative disc disease and small annular tears at L3-4, L4-5, and L5-S1; mild broadbased disc bulge at L5-S1; and degenerative joint disease involving the facet joints bilaterally at L4-5 and L5-S1 (Tr. 146). This court finds that the ALJ erred in concluding that

14

these objective physical findings could not cause the degree of pain indicated by the plaintiff in her testimony. Further, the plaintiff's pain is supported by reports from several physicians in the record, including her treating physician, Dr. Gammon (Tr. 178-79). Dr. Gammon stated that the plaintiff's physical conditions would reasonably be expected to cause chronic pain. He also found that plaintiff's pain would be distracting in work settings and would increase with physical activity (Tr. 178-79). Additionally, Dr. Patrick Mullen found that the plaintiff had a "severe pain problem" (Tr. 177). Even the SSA examining physicians found that the plaintiff had a significant pain component to her disability. Dr. Korn stated that "her subjective pain is by far and away the most substantial cause for her limitations these days, as well as her mood and mental health difficulties" (Tr. 202). Dr. Carraway stated that "[h]er ability to perform simple repetitive tasks and to persist at those tasks would be more limited by her level of chronic pain at any one particular time" (Tr. 211).

The plaintiff testified as follows at the hearing:

Q:     Okay, now if you had to try to describe the pain that you have on a regular daily basis, how would you describe it?

A:     Unbearable. Some days it's worse than others, but it's just, I don't know. They ask me on those ranges, and it's just, it keeps me confused. But I guess I'd have to say at usually a six, unless I do activities, then it gets worse.

Q:     Okay. What does the medication do for you as far as the pain is concerned?

A:     It helps me deal with it.

Q:     What do you mean, deal with it?

A:     That, I mean it never goes away, but it just, it eases it up enough to where I can try to get up and move around a little more.

(Tr. 252).

The ALJ and the Commissioner noted several examples from the plaintiff's testimony as evidence that the plaintiff's pain does not cause her severe functional

15

limitations. They admitted that the plaintiff could care for her personal needs only with difficulty (def. brief 18; Tr. 23-24). They acknowledged that the plaintiff could perform only limited cleaning activities (def. brief 18). They noted that the plaintiff drove her son to school in the morning despite testifying that she could not get out of bed some mornings (def. brief 18; Tr. 244). However, the plaintiff also testified that if she is not able to get out of bed in the morning, she has to call a friend to pick up her son (Tr. 244). She estimated that she has to call her friend for this purpose about three times per week (Tr. 252). The Commissioner notes that she watches soap operas (def. brief 18), but ignores her testimony that "I can't sit and watch [long enough to] know what's going on" (Tr. 255).

Upon remand, the ALJ is instructed to consider the plaintiff's pain and its effects on her ability to perform substantial gainful activity in accordance with the above-cited law.


### Treating Physician

The plaintiff next argues the ALJ erred in failing to assign any weight to the opinion of her treating physician. The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §416.927(d)(2) (2006); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). However, statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-2p. Furthermore, even if the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

The regulations provide that even if an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he still must consider the weight given to the physician's opinion by applying five factors: (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. §404.1527(d)(2)-(5). Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. SSR 96-2p, 1996 WL 374188, *5. As stated in Social Security Ruling 96-2p:

> A finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

Id. 1996 WL 374188, *4.

The plaintiff's treating physician, Dr. Gammon, stated in a letter dated October 14, 2005, that the plaintiff had chronic back pain requiring opiate medication, chronic depression, and chronic fatigue despite treatment, and her "symptoms have persisted despite multiple attempts at treatments over the last 3+ years. The patient is and remains completely disabled" (Tr. 178-79).

The ALJ found as follows: "I reject Dr. Gammon's opinion because it is not supported by his own records, and is also inconsistent with the longitudinal medical history" (Tr. 26). The ALJ noted that Dr. Gammon never referred the plaintiff to a psychiatrist or

17

therapist for mental health impairment. He further noted that Dr. Gammon never referred the plaintiff to a rheumatologist, orthopaedic surgeon, or neurologist. He noted the following inconsistencies: Dr. Gammon's notes provided no indication the plaintiff had the requisite trigger points to support a diagnosis of fibromyalgia; while Dr. Gammon reported to the Agency that the plaintiff had a ruptured disc, the MRI showed no evidence of this; and Dr. Gammon reported the plaintiff's sciatica was unresponsive to physical therapy, while the physical therapy records showed she made significant improvement until she quit (Tr. 26-27).

As argued by the plaintiff, several of the reasons given by the ALJ for this rejection centered around the ALJ's disagreement with the treatment decisions of the physician, rather than a discrepancy in the medical evidence. Significantly, Dr. Mullen is the only treating source contained in the record. The plaintiff testified that she sees him for medical treatment at least once a month and sometimes more often (Tr. 248-49). Even if Dr. Gammon's opinion is not well supported by the medical evidence and thus not entitled to controlling weight, his opinion should have been analyzed in accordance with the above law to determine the weight to which it was entitled. Accordingly, upon remand, the ALJ is instructed to analyze Dr. Gammon's opinion as set forth above.

### *Residual Functional Capacity*

The plaintiff next contends that the ALJ failed to properly assess her RFC. Specifically, the plaintiff claims the ALJ

> not only failed to provide specific evidence of [the plaintiff's] ability to perform work activities in a regular work setting, he overassessed [the plaintiff's] functional capacity in his determination that she was fully capable of light work. In doing so, he relied primarily on the opinions of non-examining and non-treating physicians. Those opinions also were not evaluated under the framework of 20 C.F.R. § 404.1527(d).

(Pl. reply brief 4).

18

The Residual Functional Capacity ("RFC") assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work- related activity the individual can perform based on the evidence available in the case record. *The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.* . . .

The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.

SSR 96-8p, 1996 WL 374184, *7 (emphasis added).

The plaintiff argues that, had the opinions of the non-treating and non-examining physicians been evaluated properly, they would not have been given deference over the opinion of treating physician Dr. Gammon. As set forth above, upon remand, the ALJ is to re-evaluate Dr. Gammon's opinion. The plaintiff notes that while the ALJ found that she had no limitation in sitting, standing, or walking based partially upon the examination and opinion of Dr. Korn, Dr. Korn's assessment of her functional abilities (Tr. 204-207) is not fully consistent with his written report (Tr. 199-202). For example, although Dr. Korn stated in his written report that he did not feel that the plaintiff should operate moving machinery or work above ground level (Tr. 202), he indicated in his medical source statement that the plaintiff's ability to work around "hazards," including machinery and heights, was "unlimited" (Tr. 207). His written report also noted limitations to the spine and to the left shoulder (Tr. 201), which is inconsistent with his assertions in the medical source statement that her lifting/carrying, standing/walking, sitting, pushing/pulling, and reaching were not limited in any way (Tr. 206). Further, as argued by the plaintiff, her ability to

19

perform some household duties and daily activities does not mean that she can work at a job for eight hours a day and five days a week. Upon remand, the ALJ is instructed to consider Dr. Gammon's opinion, the plaintiff's testimony, and all other evidence in evaluating the plaintiff's RFC in accordance with the above-cited law.

### Non-exertional Limitations

The plaintiff next argues that the ALJ erred by failing to obtain vocational expert testimony in light of her significant non-exertional limitations, including significant pain and depression. The plaintiff contends that as both of these limitations erode the occupational base, it limits the range of work that she is able to perform. The ALJ concluded that the plaintiff's mood and anxiety disorder were "severe within the meaning of the Regulations" (Tr. 26). The plaintiff argues that Social Security Ruling 83-12 requires that vocational expert testimony be offered by the SSA in such a situation to "clarify the implications for the occupational base." The medical records establish that the plaintiff displays several difficulties with implications for the occupational base, including moderate difficulty understanding and remembering detailed instructions as well as slight difficulty remembering short, simple instructions (Tr. 212). She also has moderate difficulty interacting appropriately with the public, supervisor, or coworkers, as well as moderate difficulty responding appropriately to changes in the routine work setting and to usual work pressures (Tr. 213). The defendant argues:

> The past relevant work the ALJ found Plaintiff could perform is only unskilled to low semi-skilled work, and thus, did not require significant understanding and remembering of detailed instructions. Moderate limitations in other areas indicated that Plaintiff could still function satisfactorily in those areas. Since the ALJ's resultant decision Plaintiff could perform light work was supported by substantial evidence, the burden did not shift to the ALJ, and he was not required to obtain vocational expert or other vocational evidence.

(Def. brief 26).

Upon remand and after evaluating the evidence as instructed with regard to the above errors, should the ALJ determine that the plaintiff cannot perform her past relevant work, he is directed to obtain vocational expert testimony in accordance with SSR 83-12.

## **CONCLUSION**

Based upon the foregoing, the Commissioner's decision is reversed under sentence four of 42 U.S.C. §405(g) with a remand of the cause to the Commissioner for further proceedings as discussed above.

IT IS SO ORDERED.


s/William M. Catoe
United States Magistrate Judge


October 1, 2007

Greenville, South Carolina